**MICHEL, Plaintiff-Appellant, v. WEBER, Defendant-Appellee.**

Ohio Appeals, Tenth District, Franklin County.

No. 5861. Decided November 5, 1958.

Donald S. McNamara, Keith McNamara, Columbus, for plaintiff-appellant.

Arthur M. Sebastian, Columbus, for defendant-appellee.

## OPINION

By BRYANT, J.

William Michel, plaintiff, appellant, brought suit in the Common Pleas Court of Franklin County against Roland L. Weber, defendant, appellee, for a judgment for $35,000 for personal injury and property damage claimed to have resulted from a collision between automobiles driven by Michel and Weber at the intersection of Bellows Avenue and Martin Street in Columbus, Ohio on November 24, 1953. The case was tried before a judge and jury and resulted in a verdict for the defendant, whereupon Michel has appealed to this court on questions of law.

On behalf of Michel there are three assignments of errors. The first one alleged error in the court's general charge; the second, that the verdict and judgment are not sustained by sufficient evidence and the third, that the verdict and judgment are contrary to law. These are discussed together in the brief of appellant and will be so treated here.

In his amended petition Michel alleges that Bellows Avenue runs east and west and Martin Street runs north and south, the two intersecting at right angles. It is further alleged that Michel was driving his 1940 Plymouth automobile south on Martin Street and Weber was driving his 1953 Buick automobile west on Bellows Avenue, that as they approached the intersection Michel was on the right and Weber on the left and that Weber was under a duty to yield the right-of-way, failed to do so, and this failure was the direct and proximate cause of the collision and resulting damage.

There were three specifications of alleged negligence: (1) the alleged failure of Weber to yield the right-of-way; (2) alleged failure of Weber to maintain a lookout ahead and observe Michel's car and (3) alleged failure of Weber to swerve his care to avoid the collision.

The answer filed by Weber admitted allegations respecting the location and character of the two streets and that they intersect at right angles, that Michel was driving south at Martin Street and Weber was driving west on Bellows Avenue and that their automobiles "came into collision" from which Michel sustained some injuries. The answer denies the nature and extent of injuries claimed and denies generally all other allegations not admitted to be true.

Perhaps the main objection raised by counsel for Michel is that the court in its general charge included instructions to the jury with respect to contributory negligence, it being the theory of Michel that the record was lacking in any evidence warranting a charge as to contributory negligence and hence that it was erroneous and prejudicial. It is not urged that the instructions as given were incorrect but rather that they were not called for by any of the evidence in the case and hence were prejudicial.

We note that the court gave special instructions at the request of counsel in advance of arguments, that contributory negligence was one of the topics of such special instructions, and that the general charge only is complained of in the assignments of errors.

The question therefore is whether or not the trial court committed prejudicial error in charging upon contributory negligence in light of

the testimony in this case. It appears to be admitted by both parties in the case that the accident occurred at an unmarked intersection and that there was neither traffic light nor stop sign located at the intersection.

There were, however, other facts brought out and other statements made which were properly before the jury and which have some bearing on the question before us. In the first place, Martin Street appears to be little more than a lane or alley. It is sixteen and one-half feet in width and has no sidewalks. On the other hand, Bellows Avenue appears to be approximately twice as wide or thirty-two or thirty-three feet in width. It further appears that the collision occurred at 8:30 or 9:00 P. M. on November 24, 1953, when darkness had fallen and both cars had their headlights burning. It further appears that the streets were wet and that rain or drizzle was falling or had very recently fallen.

There was some testimony concerning hedges or shrubbery along both sides of Martin Street just north of Bellows Avenue (Record p. 153) and Weber testified that there was an automobile parked on the north side of Bellows at or a short distance east of the intersection with Martin Street.

There was a sharp difference in the testimony of Michel and Weber with reference to the location and speed of the two vehicles. With reference to the location of his car and that of Weber's when he first saw it. Michel testified as follows (Record p. 160):

"Q. And where was his (Weber's) car when you saw it first?

"A. It was four or five maybe car lengths down the street when I saw it.

"Q. When you say 'Down the street' what do you mean?

"A. That was east of Martin.

"Q. East of Martin. Now I don't want to be technical, Mr. Michel; but didn't you yesterday say he was two or three car lengths?

"A. Maybe that is right, two or three, something in that.

"Q. But again you can't tell us what you mean in feet by car lengths?

"A. No, sir, I can't.

"Q. Where were you when you saw Mr. Weber's car two or three car lengths away?

"A. I had not yet entered the intersection, I was approaching the intersection, I just I believe got past the corner of the house, I could see cater-cornered through." (Word in parenthesis added.)

Michel further testified (Record pp. 164 and 165) as to the location of the two cars when he first saw Weber's car as follows:

"Q. You put an arrow so it will show he is going west. I believe you can sit down now, Mr. Michel. Can you tell us approximately how far north of Bellows Avenue, that is the north curb line of Bellows the front end of your car was?

"A. I believe the front end of my car was just—it was almost to the curb line, we was—I was getting ready to enter the intersection.

"Q. You just indicated it was about at the corner of this house or the south line of this house, do you mean to change that?

"A. I thought you meant the position of my car.

"Q. Yes, the position of your car when you saw the Weber car, haven't you put it on the diagram as you say it was?

"A. Well, I figure that is close enough, yes.

"Q. My question is, Mr. Michel approximately how far was it from this north curb line of Bellows Avenue to the front end of your car when you first saw the Weber car?

"A. Maybe five feet, six feet.

"Q. Five or six feet?

"A. Uh-huh.

"Q. All right; and what did you do?

"A. I proceeded on, sir.

"Q. And proceeded to make a right hand turn?

"A. Yes.

"Q. And at what speed were you proceeding?

"A. I don't believe I was going fifteen miles an hour; fifteen miles an hour or something about there.

"Q. You say you don't believe you were going fifteen miles an hour?

"A. Around fifteen miles, I wasn't going over fifteen, I don't believe, sir."

From what has been set forth above it would appear that Michel claimed he was traveling not to exceed fifteen miles an hour, that when he was a few feet away from the intersection he saw Weber's car, which was then a much greater distance away from the intersection, whereupon he entered the intersection with the intention of making a right-hand turn. Weber testified (Record p. 200):

"Q. Well, now tell the Jury, Roland, what happened as you approached and entered the intersection at Martin Avenue and Bellows Avenue?

"A. Well, I was coming up going west on Bellows and a car came out of Martin and we come together.

"Q. Do you know who was operating that car that came out of Martin?

"A. Bill Martin.

"Q. Michel?

"A. Michel.

"Q. Did you know Bill Michel before that night?

"A. No, I didn't.

"Q. Well, now, did you see Michel's car before the accident occurred?

"A. Well, for a few seconds.

"Q. Where was it, Roland, when you first saw it?

"A. Well, its front wheels was on the curb line.

"Q. The curb line of what?

"A. Of Martin—or Bellows.

"Q. You mean the north curb line of Bellows?

"A. Yes.

"Q. Then what did that car do?

"A. Come on out.

"Q. Then what did it do, anything else?

"A. Well, we collided, then it went on down, turned west.

"Q. And what happened to your car?

"A. Mine stopped—well, I applied my brakes and turned to the left, it was a little better than—not much more than half in the intersection."

Weber further testified (Record p. 202):

"Q. Now did you have any opportunity in the short time you saw Bill Michel's car before the accident to form any judgment as to the speed the Michel car was going as it came out of Martin Avenue?

"A. Going considerably faster than I was.

"Q. How fast were you going?

"A. Twenty miles an hour."

Weber further testified (Record p. 206):

"Q. You told us where the Bill Michel car was when you first saw it, where were you when you first saw Michel's car?

"A. Standing in front of mine.

"Q. Beg pardon?

"A. Oh, do you mean after it hit?

"Q. Before the accident, immediately before the accident. You have already said where he was. I am asking where your car was when you first saw him?

"A. I was about two foot or maybe a foot and half in the intersection.

"Q. When you say into the intersection, you are referring to being beyond the east line of Martin Avenue, is that it, is that what you mean?

"A. Yes."

From what has been set forth above it is apparent that it was Weber's claim that he was already partly in the intersection at the time Michel's car entered it and that the speed of Michel's car instead of being fifteen miles an hour as testified to by Michel was "considerably faster" than twenty miles an hour.

It is not necessary for us to determine which of the two conflicting claims was right. In this state of the record the court quite properly charged upon contributory negligence and submitted the conflicting testimony to the jury for their determination.

It is not in dispute that as Michel approached the intersection he had the intention of making a right turn and that at the time of the collision he was in the process of making such a right turn. It is the contention of defendant that by making a turn, Michel lost his preferential status.

Sec. 4511.41 R. C., provides as follows:

"The operator of a vehicle, streetcar, or trackless trolley shall yield the right of way at an intersection to a vehicle, streetcar, or trackless trolley approaching from the right."

Sec. 4511.01(SS) R. C., formerly §4511.01(RR) R. C., provides as follows:

" 'Right of way' means the right of a vehicle, streetcar, trackless trolley, or pedestrian to proceed uninterruptedly in a lawful manner **in the direction in which it or he is moving** in preference to another vehicle, streetcar, trackless trolley, or pedestrian approaching from a different direction into its or his path." (Emphasis added.)

Cited in support of this view is the case of **Gratziano, dba Grandview Cab Co. v. Grady, 83 Oh Ap 265,** decided by the Court of Appeals of

Franklin County, Ohio in 1948, in which branches two, seven, nine and ten of the syllabus are as follows:

"2. **Sec. 6307-40 GC,** which gives the preferential right of way to a vehicle approaching from the right, applies where the vehicle on the right proceeds 'in a lawful manner' and continues to proceed 'in the direction in which it * * * is moving,' as provided in §6307-2 GC.

"7. The Uniform Traffic Act was intended to expedite the flow of traffic, to eliminate traffic hazards and to prevent collisions."

"9. The driver of the vehicle on the left has a right to assume that the driver of the vehicle on the right will continue to proceed in the direction in which he is moving.

"10. The driver of the vehicle on the right is given the preferential right of way at an intersection over the driver of the vehicle on his left as long as the former proceeds in the direction in which he is moving; **when he changes direction he loses his preferential right of way.**" (Emphasis added.)

The case of Gratziano v. Grady, supra, was explained in the case of **Singer v. Brinks, Inc., 56 Abs 118,** decided by the Court of Appeals of Franklin County in 1949 in which a driver who was on the right stopped his car and then proceeded on in the same general direction. The argument was made that the use of the word, "uninterruptedly," in the statute removed the preferential status in the case of such a stop. The court held otherwise and in an opinion by Miller, P. J., at page 120, said:

"The appellant's interpretation of this statue is that one who interrupts his own forward movement by stopping, removes himself from the benefits of the statute. We do not agree with this construction. We think it means that the person on the right has the right to proceed continuously and without interference. **The case of Gratziano v. Grady, 83 Oh Ap 265, decided by this court, is cited, which is not on all fours with the case at bar, for there the driver of the vehicle on the right was engaged in making a left turn at a dead end intersection. He was not therefore moving in the same direction in which he has been proceeding, which removed him from the benefits of the statute.**" (Emphasis added.)

We feel that the decisions above cited correctly and clearly state the law and that the preferential status of the person on the right at an intersection is lost if he turns either to the right or left and remains with him only if he proceeds in a lawful manner in the direction in which he was traveling.

For the reasons above set forth we conclude that the assignments of errors are not well taken, that the court did not err in its general charge to the jury, that the verdict and judgment are in accord with the evidence and are not contrary to law.

The judgment of the court below will therefore be affirmed at the costs of appellant.

PETREE, PJ, MILLER, J, concur.